2002 OK CIV APP 17

### In the Matter of the ADOPTION OF O.L.P., a minor child.

Norma Jean Posey, Petitioner/Appellee,

v.

Jacqueline O. Ketchum, Respondent/Appellant.

No. 95,866.

Court of Civil Appeals of Oklahoma, Division No. 1.

Sept. 7, 2001.

Rehearing Denied Oct. 12, 2001.

Certiorari Denied Jan. 8, 2002.

Charles L. Woodstock, Tulsa, OK, for Appellant.

Robert P. Skeith, Tulsa, OK, for Appellee.

LARRY JOPLIN, Judge:

¶ 1 Respondent/Appellant Jacqueline O. Ketchum, natural mother (Mother) of O.L.P. (Child), seeks review of the trial court's order holding Child eligible for adoption without Mother's consent on a finding of abandonment pursuant to 10 O.S. § 7505–4.2(G). In this proceeding, Mother asserts the trial court erred as a matter of both law and fact in so ruling. Having reviewed the record, however, we find no errors as alleged, and hold the order of the trial court should be affirmed.

¶ 2 Mother gave birth to Child prematurely on February 25, 1992. Hospital staff subsequently determined Child to be drug dependent as a result of Mother's drug use during pregnancy.

¶ 3 Child remained in the hospital for four months. Upon release, Mother, Child and Mother's boyfriend, the Child's putative father, moved in with the boyfriend's mother, Petitioner/Appellee Norma Jean Posey.

¶ 4 About a month later, in July 1992, Mother came home late, drunk. After a confrontation with Ms. Posey, Mother moved out, leaving Child behind.

¶ 5 About two weeks later, the boyfriend took Child to Mother. However, within a few days, Mother left Child with Ms. Posey. Mother, however, never returned, and subsequently contributed nothing for Child's maintenance and care.

¶ 6 In November 1992—at that time, having had no other contact with Child—Mother was arrested and charged with "robbery by force," for which crime she was convicted and sentenced to 15 years in prison. In May, 1993, Mother escaped from prison, but was recaptured within hours, and later received an additional two year sentence of confinement for the escape.

¶ 7 In late 1994, Mother's boyfriend brought Child to see Mother in prison two or three times. In 1996, Mother's father started bringing Child to visit Mother about once a month. That same year, Ms. Posey obtained appointment as Child's guardian with Mother's consent.

¶ 8 In 1999, Mother launched an action to determine paternity of Child, and testing showed Mother's boyfriend was not Child's father. Mother subsequently sought substitution of her parents as Child's guardian. Ms. Posey petitioned for Child's adoption. The trial court consolidated the guardianship and adoption proceedings for determination.

¶ 9 At trial, the parties adduced evidence of the facts we have recounted. Mother testified that she now sends Child cards, letters and gifts and tries to have as much of a relationship with her as is possible, but that she cannot contribute financially to Child's care. Mother denied any intent to abandon Child at any time, and expressed her desire for custody when she is released from prison, ostensibly in 2001. Mother admitted she harbored considerable doubt concerning her boyfriend's paternity of Child *ab initio*, but never told him.

¶ 10 On consideration of the evidence, the trial court found that Mother abandoned Child, rendering her consent to the adoption unnecessary pursuant to § 7505–4.2(G). Mother now appeals, asserting (1) the evidence clearly demonstrated her maintenance of a significant relationship with Child, (2) the trial court's conclusion of abandonment is against the clear weight of the evidence, and (3) the trial court improperly relied on a

comparison of the parties to reach its decision.

■ ¶ 11 The issue of abandonment is a question of fact. *Matter of James H.,* 1978 OK CIV APP 28, 593 P.2d 1095, 1097. In matters of consentless adoptions, we review to determine whether the trial court's conclusion is supported by the weight of the requisite clear and convincing evidence. *Matter of Adoption of R.W.S.,* 1997 OK 148, 951 P.2d 83, 86; *Matter of Adoption of J.L.H.,* 1987 OK 25, 737 P.2d 915, 918.

¶ 12 The Oklahoma Adoption Code, 10 O.S. Supp.1998 § 7501–1.1 et seq., contains no definition of "abandonment" for purposes of the application of § 7505–4.2(G). The parties cite, and we find, no Oklahoma precedent adopting a definition of "abandonment" for purposes of § 7505–4.2(G).

¶ 13 However, the Oklahoma Children's Code contains a definition of the term, but that definition specifically does not apply to adoption cases. 10 O.S. Supp.2000 § 7006–1.1(A)(20), (C). The Oklahoma Supreme Court has applied the definition of abandonment from the Uniform Child Custody Jurisdiction and Enforcement Act (UCCJEA), 43 O.S. Supp.1999 § 551–102, on review of the subject matter jurisdiction of a state district court "under the *emergency* jurisdiction provision applicable to cases of abandonment contained in § 7502–1.1(A)(4) of the Oklahoma Adoption Code." *White v. Adoption of Baby Boy D.,* 2000 OK 44, ¶ 40, 10 P.3d 212, 221. (Emphasis added.) However, we are presented with no question of emergency subject matter jurisdiction in the present case, and read nothing in *White* as standing for the proposition that the UCCJEA definition of abandonment should be applied in *all* cases under the Oklahoma Adoption Act generally, or in 10 O.S. § 7505–4.2(G) consentless adoption cases specifically.

■ ¶ 14 The right of a parent to the care, custody, companionship and management of her child is a fundamental right protected by the federal and state constitutions. *J.V. v. State,* 1977 OK 224, 572 P.2d 1283, 1284; *Matter of Adoption of Darren Todd H.,* 1980 OK 119, 615 P.2d 287, 290; *Matter of Adoption of V.A.J.,* 1983 OK 23, 660 P.2d 139, 141. However, where a natural parent fails to demonstrate a full commit-

ment to the responsibilities of parenthood, the state is not constitutionally or statutorily compelled to heed the parent's objections to the adoption of his or her child. *In re Adoption of Zschach,* 75 Ohio St.3d 648, 665 N.E.2d 1070, 1073 (1996)[1]; *Lehr v. Robertson,* 463 U.S. 248, 262, 103 S.Ct. 2985, 2993–2994, 77 L.Ed.2d 614 (1983).[2]

¶ 15 By § 7505–4.2, the Oklahoma legislature has statutorily defined specific instances of a natural parent's failure to exercise the rights and obligations of parenthood as sufficient to dispense with the parent's consent to the adoption of his or her child. By force of § 7505–4.2(G), where the natural parent has "abandoned" his or her child, the child may be adopted without the natural parent's consent.

¶ 16 In the absence of a statutory definition of that term, we must ascribe to statutory language its ordinary meaning, unless a contrary intention plainly appears. *See, e.g., Neer v. State ex rel. Oklahoma Tax Com'n,* 1999 OK 41, ¶ 16, 982 P.2d 1071, 1078.[3] In cases of consentless adoptions and termination of parental rights, decisions from other jurisdictions define "abandonment" as "conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship," or "conduct which evinces a settled purpose to forego all parental duties." *State in Interest of J.R.T. v. Timperly,* 750 P.2d 1234, 1236 (Ut.App.1988); *Pender v. McKee,* 266 Ark. 18, 582 S.W.2d 929, 932 (1979); *Adoption of Doe,* 89 N.M. 606, 555 P.2d 906, 917 (1976). The inquiry generally focuses on the parent's "subjective intent" as manifested by "objective conduct." *J.R.T.,* 750 P.2d at 1236.

¶ 17 Given the constitutionally protected nature of the parent-child relationship, but considering the constitutionally permitted severance of the relationship where a parent fails to undertake the duties and obligations of that role, we believe the question of "abandonment" in consentless adoption cases under § 7505–4.2(G) must necessarily include some inquiry into the natural parent's subjective intent, manifested by objective conduct, to exercise the duties and obligations of a parent to his or her child(ren). Applying such a definition to the instant controversy, the parties presented evidence to the trial court, in our estimation if believed by the finder of fact, which clearly and convincingly supports two conclusions. First, Mother exercised no parental responsibilities in any meaningful way after O.L.P.'s birth in February 1992. Second, Mother expressed no intent—objectively or subjectively—to establish a parent-child relationship with O.L.P. until well after Mother's arrest, conviction and the imposition of a sentence of fifteen years confinement for the crime of robbery by force in late 1992 and early 1993.[4]

¶ 18 On the evidence, and in deference to the fact-finder's determination, we cannot say the trial court's conclusion of Mother's abandonment of Child under the provisions of § 7505–4.2(G) lies so contrary to the weight of the evidence as to warrant our intervention. The order of the trial court is therefore AFFIRMED.

¶ 19 ADAMS, P.J., and JONES, J., concur.

---

1. "Where a putative father fails to demonstrate ... a [full] commitment [to the responsibilities of parenthood], the state should not be compelled to listen to his opinion of where the child's best interests lie."

2. "The significance of the biological connection is that it offers the natural [parent] an opportunity that no other ... possesses to develop a relationship with his [or her] offspring. If [the natural parent] grasps that opportunity and accepts some measure of responsibility for the child's future, he [or she] may enjoy the blessings of the parent-child relationship and make uniquely valuable contributions to the child's develop-

ment. If he [or she] fails to do so, the Federal Constitution will not automatically compel a state to listen to his [or her] opinion of where the child's best interests lie."

3. "[T]erms in a statute are given their plain and ordinary meaning, except when a contrary intention plainly appears and the words of a statute should generally be assumed to be used by the law-making body as having the same meaning as that attributed in ordinary and usual parlance."

4. Plus a subsequently imposed two years of additional confinement for her May 1993 escape from a penal institution.